UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

v.                      CR-1-10-35

GREGORY JONES,

       Defendant.

**ORDER**

This matter is before the Court upon defendant's Motion to Suppress (doc. no. 19) and the Government's Response thereto (doc. no. 22). In his Motion, the defendant moves the Court to suppress all evidence obtained from the defendant as a result of the government's unconstitutional search and seizure of the defendant. As explained in this Order, the only evidence secured by police on the scene was a gun in the street. A hearing was held in this matter on Wednesday, September 22, 2010.

The testimony offered at the hearing was from three police officers: David Doizer, Adrienne Brown, and Christopher Clarkson. The Court also viewed a surveillance tape.

Based upon the evidence received at the hearing, after observing the demeanor of the witnesses, the Court makes the following Findings of Facts and Conclusions of

1

Law.

## FINDINGS OF FACT

Defendant Jones is charged in a one-count Indictment with being a felon in possession of a firearm in violation of Title 18, United States Code, Sections 922(g)(1) and 924(a)(2) and (d), with a forfeiture allegation.

All the witnesses are experienced police officers who are currently or were, at some point, working out of District One. They are all familiar with the area's reputation as a high-crime area, as all have gone on numerous drug runs and reports of shootings. David Dozier is a six-year veteran of the Cincinnati Police Department ("CPD"). Adrienne Brown has been with the CPD since 1999. Both are currently assigned to the Vortex Unit, primarily dealing with troubled drug areas, making undercover buys with confidential informants. Christopher Clarkson has been a police officer since 2007.

During the afternoon of October 27, 2009, the witnesses were working as a part of a detail of off-duty police that was operating in the Over-the-Rhine section of Cincinnati. They were employed by the Over-the-Rhine Chamber of Commerce to patrol the area. The director of the unit was a retired police officer, Don Ruberg. He would "spot" from a vantage point and broadcast information on a radio channel to patrolling off-duty police officers.

Uniformed Officers Doizer and Brown were in their cruiser on McMicken Avenue when Ruberg dispatched information that a black male would be exiting a building on

2

Race Street with a large quantity of illegal drugs. The suspect was described as wearing a black hooded sweatshirt, a red t-shirt, and jeans. Officer Brown heard the information because she was listening to the channel on which Ruberg broadcast information (Channel C). Officer Dozier was on Channel A, the dispatch channel, so only learned of the information through Officer Brown. The officers testified that they did nothing to independently verify the information they received.

They headed south on Race Street and saw a person fitting the description heading north on Race Street, approaching the Jazmin Carryout Store. Dozier testified that when they pulled up in the cruiser, the suspect kept his eyes on them and then went into the store. Brown testified that the suspect put his hand in his left pocket. Officer Dozier testified that he could not state with certainty that the suspect was not on the way into the store before he saw the cruiser.

The officers exited their cruiser and went into the store. Officer Brown stayed by the door. After a few seconds the suspect approached the door to leave with his purchase of a bottle of water. Officer Dozier testified that he approached the suspect inside the store and asked him if he had anything illegal on his person, the suspect indicated he did not, and the suspect gave consent for a pat-down. Dozier took the bottle of water out of the suspect's hand and raised his arms up over his head. Immediately, the suspect broke away and ran through the door, pushing Brown out of the way. She testified that she tried to hold onto him by grabbing his arm, but he pulled out of his jacket. Dozier attempted to taser him but was unsuccessful. Brown

3

testified she saw him discard something from his waistband at Findlay and Race Streets.

The officers pursued the suspect on foot. He ran eastbound on Findlay, then north. He jumped over a cruiser and leapt over a 10 to 20-foot fence. Officer Dozier stopped to assist Officer Brown when she fell. At that point, they lost sight of the suspect when he went through a wooded area. They did not know the identity of the suspect. An arrest report was prepared by Officer Brown.

During these events, Officer Christopher Clarkson was in a cruiser nearby, in the 2000 block of Vine Street. He was monitoring Channels A and C and had heard some of the information broadcast by Ruberg. He made a U-turn and took McMicken Street to Race Street. As he drove down Race Street, he saw the co-owner of the Jazmin Carryout Store waving to him and pointing to a gun in the street 15 to 30 feet north of the Jazmin Carryout Store at Race and Findlay Streets. Clarkson took photographs of it and called the officers from the store to advise them that he had found a gun at the corner and he had it in the trunk of his car. The serial number was visible.

In Court, Officer Clarkson identified Exhibit #2 as the .380 caliber, Bersa, model Thunder 380, semi-automatic handgun he had recovered. There were no fingerprints on the gun.

Officer Clarkson testified that he did not find a jacket, although he looked for it briefly. He asked the store owner about a jacket. The store owner replied that he

4

was focused on the gun. Officer Clarkson admitted that the scene had not been secured. He knew there was a store video and secured the video tape from the carryout store.

Officer Dozier testified about his decision to stop and frisk the suspect. He admitted he had been dispatched to a high crime area on the basis of information provided by an informant about whom Dozier knew nothing and whose identity is unknown to the record. He had information that an individual in a black sweatshirt had a large quantity of drugs on his person. He did not see the suspect coming out of a building. He saw a person wearing clothes meeting the description broadcast walking north on Race Street. Officer Dozier confirmed that he had no reason to believe the suspect had a gun. The information provided was that he had drugs and no drugs were ever found. The suspect was not familiar to the officers. Officer Dozier testified that he had decided to pat him down based on "how he looked and acted", that he looked like he was concealing something and kept his hand on his right side and that, in Over-the-Rhine, people holding something (drugs or guns) act evasive.

When Officers Dozier and Brown went to work the next day, they were given a message concerning the incident. Officer Brown testified that she returned the call and was told that the suspect was Greg Jones and that he was residing at Talbert House on Vine Street. Brown ran a name search and printed out a picture of the defendant. The officers inquired at Talbert House and were told that Mr. Jones would return shortly. About 15 to 20 minutes later, they received a call that the defendant

5

had returned.

The officers went up to his room and identified him by his picture. Brown advised him of his *Miranda* rights. He became agitated when they placed him under arrest. Brown testified that he eventually seemed unconcerned and actually fell asleep at the Police Station.

The officers obtained a search warrant to take his DNA sample. A DNA test was done on the gun, but none was found.

Defendant argues that the gun should be suppressed because it was the fruit of an illegal seizure. The government argues that the defendant was never seized, therefore, the gun was abandoned and not subject to suppression.

## CONCLUSIONS OF LAW

"There are three categories of interaction between police and citizens: consensual encounters, temporary detentions (or *Terry* stops), and arrests. The Fourth Amendment applies only to the latter two. A police officer must have a reasonable suspicion to conduct a temporary detention and probable cause to conclude an arrest, while no objective justification is required to initiate a consensual encounter." *United States v. Ushery*, 968 F.2d 575, 578 (6th Cir.), *cert. denied*, 506 U.S.946 (1992).

"A person is seized by the police and thus entitled to challenge the government's action under the Fourth Amendment when the officer, 'by means of

6

physical force or show of authority,' terminates or restrains his freedom of movement, *Florida v. Bostick,* 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (quoting *Terry v. Ohio,* 392 U.S. 1, 19, n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)), ' *through means intentionally applied,' Brower v. County of Inyo,* 489 U.S. 593, 597, 109 S.Ct. 1378, 103 L.Ed.2d 628 (1989) (emphasis in original)." *Brendlin v. California,* 551 U.S. 249, 254 (2007). "A police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission; otherwise, there is at most an attempted seizure, so far as the Fourth Amendment is concerned. See *California v. Hodari D.,* 499 U.S. 621, 626, n. 2, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991); *Lewis, supra,* at 844, 845, n. 7, 118 S.Ct. 1708." *Brendlin v. California,* 551 U.S. 249, 254 (2007).

In *Hodari D,* police cruisers approached a group of youth. The defendant began to run. While he was running, he discarded drugs. The United States Supreme Court states, 499 U.S. at 623-624:

> As this case comes to us, the only issue presented is whether, at the time he dropped the drugs, *Hodari* had been "seized" within the meaning of the Fourth Amendment. If so, respondent argues, the drugs were the fruit of that seizure and the evidence concerning them was properly excluded. If not, the drugs were abandoned by *Hodari* and lawfully recovered by the police, and the evidence should have been admitted.

The Supreme Court continues, 499 U.S. at 625:

> To say that an arrest is effected by the slightest application of physical force, despite the arrestee's escape, is not to say that for Fourth Amendment purposes there is a *continuing* arrest during the period of fugitivity. If, for example, Pertoso had laid his hands upon Hodari to

7

arrest him, but Hodari had broken away and had *then* cast away the cocaine, it would hardly be realistic to say that that disclosure had been made during the course of an arrest.

. . . . .

The narrow question before us is whether, with respect to a show of authority as with respect to application of physical force, a seizure occurs even though the subject does not yield. We hold that it does not.

In *United States v. Martin,* 399 F.3d 750 (6th Cir.2005), the United States

Court of Appeals for the Sixth Circuit addressed a case in which a police detail was

employed to patrol a housing authority in a high crime area. They noticed defendant

walking on the sidewalk and they attempted to arrest him for trespassing because he

was prohibited from being on those premises. When they pulled over, he ran. During

the ensuing chase, an officer saw the defendant discard a revolver.

The *Martin* court found the officers lacked reasonable suspicion, defendant had

abandoned the gun, and the case was controlled by *United States v. Hodari D,* 499

U.S. 621 (1991). The *Martin* court concluded, 399 F.3d at 753:

The district court correctly held that defendant did not submit to the show of authority made by the officers. Instead of submitting, he attempted to flee. In the process of fleeing, he discarded his revolver. Because he had not been seized when he discarded his revolver, under *Hodari D.,* he abandoned it, and it is irrelevant whether police misconduct caused the abandonment.

Defendant argues that the Court should apply the holding in *United States v. Johnson*, —F.3d—, 2010 WL 3489004 (C.A.6(Tenn)). In that case, officers acted on a 911 call asserting that people were "walking around the caller's apartment'. When they saw the defendant, they ordered him to stop, but he did not respond. He stood still. He did not follow further directions, but he did not flee.

The defendant argued that the police did not have reasonable suspicion to detain him. The *Johnson* court determined this issue involves two questions: First, at what point did the officers seize Johnson, triggering the protections of the Fourth Amendment? Second, did the officers have reasonable suspicion at that point?

The *Johnson* court stated, 2010 WL 3489004, at *7 :

A person is seized when an officer "by means of physical force or show of authority, has in some way restrained [his] liberty," *Terry,* 392 U.S. at 19 n. 16, such that "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave," *Michigan v. Chesternut,* 486 U.S. 567, 573, 108 S.Ct. 1975, 100 L.Ed.2d 565 (1988) (internal quotation marks omitted). In addition, an individual must actually yield to the show of authority to be seized within the meaning of the Fourth Amendment. *Brendlin v. California,* 551 U.S. 249, 254, 127 S.Ct. 2400, 168 L.Ed.2d 132 (2007); *California v. Hodari D.,* 499 U.S. 621, 626, 111 S.Ct. 1547, 113 L.Ed.2d 690 (1991).

The *Johnson* court found the defendant was seized at the time he yielded to the officers' yelled command. The *Johnson* court explained that "[i]t is enough to stop and remain stopped."2010 WL 3489004, at *8 The *Johnson* court also found that the totality of the circumstances did not provide a particularized and objective basis for suspecting the defendant of criminal activity.

9

In *Terry v. Ohio*, 392 U.S. 1 (1968), the United States Supreme Court articulated the standard for conducting a stop and detention. In analyzing the reasonableness of a detention, we will consider "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. A temporary detention for questioning does not require a showing of probable cause if it is justified by specific and articulable facts that give rise to a reasonable suspicion of criminal activity. *Terry*, 392 U.S. at 21. In order to conduct a lawful stop and detain a suspect, a police officer must be able to point to "specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrants" a belief that criminal activity is afoot. Reasonable suspicion is based on the totality of the circumstances and has been defined as requiring "articulable reasons" and "a particularized and objective basis for suspecting the particular person . . . of criminal activity." *United States v. Payne*, 181 F.3d 781, 788 (6th Cir.1999)(*quoting United States v. Cortez,* 449 U.S. 411, 417-18 (1981)).

A pat down during a stop is reasonable when additional facts are present which indicate that the person may be armed. *United States v. Campbell*, 549 F.3d 364, 373 (6th Cir.2008). This can be performed based upon reasonable suspicion that he may be armed and dangerous. *Arizona v. Johnson,* – U.S. –, 129 S.Ct. 781 (2009).

10

When determining whether reasonable suspicion for a stop exists, this court must give "due weight" to an officer's determination. *See United States v. Arvizu,* 534 U.S. 266, 273-274, (citing *Ornelas v. United States,* 517 U.S. 690, 699 (1996)). The Court has held that an officer's specialized training and experience may permit him to make inferences from and deductions about the cumulative information available to him that "might well elude an untrained person." *Arvizu,* 534 U.S. at 273 (citing *United States v. Cortez,* 449 U.S. 411, 418 (1981)).   A determination that reasonable suspicion exists, however, need not rule out the possibility of innocent conduct. *Id.* at 277.

Viewing the totality of the circumstances and giving due deference to the factual inferences of the officers, the Court finds that the officers did not seize the defendant because he never actually yielded to the show of authority and there was no search because the defendant fled before the officer could do anything other than take a bottle of water from him.

The Court is unable to find that this was a consensual encounter.   It is impossible for the Court to determine from the surveillance tape and the testimony that the defendant consented.   It seems unlikely that he could have in the time involved.

11

There was no seizure because there was no actual submission. There was an attempted seizure. The encounter in the store lasted less than a minute. Less than 25 seconds elapsed from the time Dozier approached the defendant to the time he fled. Like the defendants in *Hodari D* and *Martin,* the defendant did not yield to the officers' show of force. Although the defendant allowed the officer to take the water bottle from his hand, unlike the defendant in *Johnson*, the defendant did not submit.

The dictates of the Fourth Amendment would have precluded a search, pat-down, and/or seizure as the officers did not have specific, articulable facts which gave rise to a reasonable suspicion to believe criminal activity was afoot at the time they attempted to stop defendant. A pat-down during the stop would have been unreasonable because additional facts were not present which would indicate that the suspect may be armed.

Based on the findings that the defendant was not seized, the gun was found in plain view on the street, and was abandoned, the gun is not subject to suppression. Whether the gun is admissible is a matter for trial.

## CONCLUSION

Accordingly, defendant's Motion to Suppress is **DENIED** in its entirety.

**IT IS SO ORDERED.**

Herman J. Weber, Senior Judge
United States District Court

12